821 So.2d 342 (2002)
Henry JORDAN, an incompetent, by and through Essie SHEALEY, his guardian, Appellant,
v.
Thomas A. MASTERS, Joseph Lawrence, and Macedonia Baptist Church of Riviera Beach, Florida, Inc., a Florida corporation, Appellees.
Nos. 4D99-1048, 4D99-1079.
District Court of Appeal of Florida, Fourth District.
June 19, 2002.
*344 Jane Kreusler-Walsh of Jane Kreusler-Walsh, P.A., West Palm Beach, Michael G. Cooksey of Cooksey & Cooksey, P.A., Riviera Beach, and Charles H. Torres of Charles H. Torres, P.A., Denver, Colorado, for appellant.
Ann H. Perry of Hanson, Perry & Jenson, P.A., West Palm Beach, and Law Office of Robert S. Glazier, Miami, for appellee Thomas A. Masters.
Mark Hicks and David Maher of Hicks & Anderson, P.A., Miami, and Law Office of Maurice J. Hall, P.A., West Palm Beach, for appellees Joseph Lawrence and Macedonia Baptist Church.
WARNER, J.
This appeal arises from a lawsuit filed by Henry Jordan, an incompetent, alleging Reverend Thomas Masters sexually abused him. Jordan sued Masters on many theories, the ones reaching a jury determination being sexual battery, false imprisonment, breach of fiduciary duty, and intentional infliction of emotional distress. Jordan also sued Deacon Joseph Lawrence and Macedonia Baptist Church, alleging a breach of fiduciary duty based upon their actions in connection with Jordan's allegations against Masters. After the jury rendered a verdict as to all defendants in favor of Jordan, the trial court directed a verdict in favor of Lawrence and the church on the breach of fiduciary duty claim based upon Doe v. Evans, 718 So.2d 286 (Fla. 4th DCA 1998), prompting this appeal. Masters cross-appeals the final judgment entered in favor of Jordan and against him on a similar breach of fiduciary duty. The supreme court recently quashed Doe in Doe v. Evans, 814 So.2d 370 (Fla.2002). As a result, we reverse the directed verdict. On cross-appeal, appellees have also raised several evidentiary errors committed by the trial court. We conclude that harmful error was committed, and we reverse for a new trial.
The gist of this case involves Jordan's claim that Reverend Masters sexually *345 abused him. He further claims that the church and Lawrence conducted an investigation of the incident using improper means, including intimidation and harassment. Jordan alleged the church and its officers had a fiduciary duty to protect him. The issue of whether the First Amendment barred the action against the church defendants was raised at trial, but the trial court permitted the case to go to the jury. A substantial verdict, including punitive damages, was rendered against all defendants. After the trial was completed, our court decided Doe v. Evans, in which we held that the First Amendment barred a breach of fiduciary duty claim against a church and its pastor stemming from an inappropriate sexual relationship which arose out of a counselor/counselee relationship. 718 So.2d at 293. On motion for rehearing and renewed motion for a directed verdict in this case, the court entered a directed verdict in favor of Lawrence and the church. It also denied the motion for new trial on the other issues raised, prompting this appeal.
Because the directed verdict was grounded on Doe v. Evans, and it was being considered by our supreme court, we awaited their decision. The supreme court determined that Doe's breach of fiduciary duty claim was not barred by the Establishment Clause of the First Amendment where the court was not being called upon to interpret ecclesiastical doctrine. 814 So.2d at 376. Instead,
the focus is on whether the Church Defendants had a fiduciary relationship with Doe giving rise to a duty and whether they breached this duty by failing to protect Doe from Evans.... [T]he resolution of this dispute does not depend on "extensive inquiry by civil courts into religious law and polity," or interpretation and resolution of religious doctrine. Thus, we foresee no excessive entanglement based on the allegations of Doe's amended complaint.
Id. (citation omitted).
We asked the parties for supplemental briefing on the application of Doe to this case. All parties agreed that Doe is controlling such that entry of the directed verdict in favor of the church and Lawrence must be reversed.[1] Because of this concession by the parties, we reverse the final judgment entered in favor of the church and Lawrence without further analysis.
On cross-appeal, all of the defendants seek reversal based upon several of the trial court's evidentiary rulings. We address two in detail. First, the church and Lawrence claim that the trial court erred in giving a jury instruction on an adverse inference arising from their failure to produce evidence. They contend that there was no evidence to justify the instruction. Second, all defendants argue the court erred in permitting Jordan's counsel to read parts of an expert's deposition, whom the defendants hired and did not call as a witness, when the evidence was offered solely to impeach that witness and to disparage defense counsel. We agree that each of these rulings was harmful error. We summarily dispose of the remaining issues.

(1) Adverse Inference Instruction

A good portion of the trial focused on Jordan's recantation of his allegations against Reverend Masters before the *346 church congregation, an idea prompted by Deacon Lawrence. The recantation was recorded on audiotape, which the jury heard. Jordan claimed the event also was videotaped but the church never delivered the video to his counsel, even after repeated requests. Deacon Lawrence told Jordan his recantation to the church would be audio, and video, taped. Reverend Masters testified that all church services are videotaped; however, one of the parishioners thought that videotaping the services may not have begun until sometime after this 1992 incident. The camera operator did not even remember Jordan's recantation or recording it. In any event, no video was ever produced.
At trial, over defense objection, the court agreed to give the following jury instruction, "[w]here a party fails to produce evidence within his control, an adverse inference may be drawn that the withheld evidence would be unfavorable to the party failing to produce it." Jordan requested the instruction based upon Public Health Trust of Dade County v. Valcin, 507 So.2d 596 (Fla.1987), and New Hampshire Insurance Co. v. Royal Insurance Co., 559 So.2d 102 (Fla. 4th DCA 1990). In Valcin, the court approved the adoption of a rebuttable presumption of negligence in a medical malpractice case where operative notes were either missing or inadequate due to the negligence of the hospital or doctors, if the plaintiff establishes "to the satisfaction of the court that the absence of the records hinders his ability to establish a prima facie case." 507 So.2d at 599. Since, in this case, the absence of the videotape did not impair Jordan's ability to prove a prima facie case, there was no need for a Valcin-type instruction.
New Hampshire Insurance dealt with the dismissal of a complaint on a discovery violation for failure to produce evidence. We cited to Valcin for the proposition that "where a party fails to produce evidence within his control, an adverse inference may be drawn that the withheld evidence would be unfavorable to the party failing to produce it." N.H. Ins. Co., 559 So.2d at 103 (emphasis added). Valcin was raised only to show that alternatives to dismissal were available as a sanction for discovery violations. However, it is apparent from the case that we were assuming the destroyed evidence may have been essential to the defendant's case. New Hampshire Insurance did not involve a trial or the issue of an appropriate jury instruction.
We have found no case approving an instruction for an adverse inference to be drawn from the failure to produce evidence. Concerning a comparable charge on failure to produce a witness, the third district held that it was proper to deny a jury instruction on the subject. See Lowder v. Econ. Opportunity Family Health Ctr., Inc., 680 So.2d 1133, 1136 (Fla. 3d DCA 1996). The court noted that Florida Standard Jury Instruction 2.3 recommends no charge be given on the failure to produce a witness, except in special circumstances. Instead, this should be left to the argument of counsel because an inference is in essence the determination of the existence of a fact from other facts. See id. at 1136-37. "Whether the inferred fact is found to exist will be decided by the trier of fact." Charles W. Ehrhardt, Florida Evidence § 301.1 (2001 ed.). It is not the position of the trial court to instruct the jury as to the facts of a case. See S. Pine Co. v. Powell, 48 Fla. 154, 37 So. 570, 571 (1904). For the court to tell a jury that an adverse inference may be drawn from the failure to produce evidence invades the province of the jury.[2]
*347 On the other hand, a Valcin-type rebuttable presumption fulfills a different purpose. Where evidence necessary to prove a prima facie case is missing due to the actions of the opposing party, the Valcin presumption shifts the burden of proof to ensure that a jury decides the issue of negligence. See Valcin, 507 So.2d at 601. As the court noted in Valcin, this presumption implements the public policy expressed in the statutory requirement that adequate notes of medical operations be kept. See id. Thus, the presumption supplies an essential element of the case, negligence, and shifts to the defendant the burden of proving non-negligence.
Jordan requested the instruction given in this case on the authority of Valcin, and the defendants objected on the ground that there was no evidence that the videotape ever existed. As the Valcin court discussed, the issue raised by the defendants' objection is a preliminary question for the trial court to determine. 507 So.2d at 601. It must first decide whether the allegedly missing evidence should have or did exist. Then, the court must determine whether the missing evidence hindered the plaintiff's ability to proceed. As such, the trial court in this case should have determined both issues before giving Jordan's adverse inference instruction, but it determined neither.
Jordan failed to offer any evidence to support either the existence of the videotape or his inability to proceed without it. While Deacon Lawrence agreed that he asked Jordan whether he minded being tape recorded and videotaped, Lawrence did not know whether the videotape was actually produced. Reverend Masters testified that there was no recording and that sometimes the video recorder failed to work. Finally, the video operator did not remember taping the recantation. The mere fact that Jordan was asked if he minded being videotaped does not constitute sufficient evidence to support a presumption that he was in fact videotaped, or that the video tape was ever in existence.
We note for completeness that Jordan also did not satisfy the second requirement of Valcin, although no objection on this ground was raised at trial. Valcin requires that the missing evidence be essential to the opposing party's prima facie case. 507 So.2d at 599. Valcin is very clear on the limited function of the presumption. Accord King v. Nat'l Sec. Fire & Cas. Co., 656 So.2d 1335, 1336-37 (Fla. 4th DCA 1995), disapproved on other grounds by Murphy v. Int'l Robotic Sys., Inc., 766 So.2d 1010, 1029 n. 21 (Fla.2000). Here, the absence of the video tape in no way prevented Jordan from presenting a prima facie case of liability. In fact, the jury heard the audio tape of the recantation, and Jordan was able to testify regarding it, as did several other witnesses. Therefore, the instruction also was improper on this ground.[3]
Lawyers are entitled to argue adverse inferences from the evidence as part of their closing arguments. However, the court, who instructs the jury on the law to apply to the facts, interferes with the jury's function when it instructs the jury as to the facts that it can find, especially where there is conflicting evidence and inferences which can be drawn. See S. Pine Co., 37 So. at 571. This was particularly harmful in this case where Jordan's counsel made several other references to witnesses not called and other *348 tapes not heard by the jury. The adverse inference instruction constituted a comment on the evidence by the trial court and approval for the jury to conclude that all of that evidence would be unfavorable to the defendants.

(2) Reading of Dr. Sullivan's Deposition

Dr. William Sullivan was retained by the church and Lawrence to perform an examination of Jordan's competency to be a witness, but the doctor was withdrawn as a witness prior to trial. Nevertheless, at trial, Jordan's counsel told the court that he would read Sullivan's deposition as part of his case-in-chief. He emphasized Dr. Sullivan's testimony in opening, stressing that Sullivan was a defense expert whom the defense would not call. Counsel stated that Sullivan did not know a lot of the facts and chronology of the case when he rendered his opinion but that he had three opinions favorable to Jordan's position.
During his case, Jordan's counsel read approximately fifty-three pages of Sullivan's deposition. The pages read consisted of a recitation of some of the doctor's curriculum vitae, but the questions revealed his lack of experience in dealing with cases of sexual abuse on retarded persons. Counsel then questioned Dr. Sullivan on matters of which he was unaware and on information that he did not receive with regard to Jordan. At no time was Dr. Sullivan asked what opinions he formed as a result of his examination of Jordan. In fact, the entire series of questions and answers amounted to cross-examination with the intent to discredit Dr. Sullivan. Only a very few questions inquired of his opinions. He was asked whether retarded children who have been the victims of crime have difficulty reporting their experience, and he opined they would, due mainly to their lack of language skills and difficulty with abstract thinking. He also agreed with the attorney's proposition that retarded children have difficulty quantifying time and information. Finally, when asked whether it was proper for the church authorities to independently question Jordan without his parents being present, one of the claims in this case, he simply stated that it was a "dumb thing to do." It is actually hard to understand some of the questions and answers in the deposition excerpts because they obviously relate to opinions which were never presented to the jury.
Jordan's counsel suggested Dr. Sullivan's testimony demonstrated that the defendants did not provide him with all the necessary information regarding Jordan and that had they done so, his opinion probably would be different. However, we fail to see that this was a relevant inquiry when the doctor's opinion was never elicited by anyone. Instead, as the defendants suggest, Dr. Sullivan's deposition excerpts were read to destroy the credibility of a defense expert and to destroy the credibility of the defense and defense counsel by leading the jury to believe that the defendants were not forthright with their own expert.
The defendants argued both at trial and here that this cross-examination seeking to destroy the credibility of Dr. Sullivan was improper impeachment. Section 90.608, Florida Statutes (1997), provides the means for impeaching a witness, including (a) using prior inconsistent statements; (b) showing bias; (c) attacking the character of the witness; (d) showing a defect in capacity or ability to observe and recount the matters about which the witness testified; and (e) using other witnesses to prove that material facts are not as testified to by the witness being impeached. The information elicited through the deposition experts does not fall into any of these categories. Therefore, it was improper impeachment evidence.
*349 Because it was improper impeachment, the defendants claimed at trial that the evidence was not relevant and argue in their briefs that the deposition was used improperly "to destroy the credibility of the defendants and their counsel." (Masters Brief, p. 33). "Relevant evidence is evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat. (1997). As Professor Ehrhardt notes, "[i]ncluded within the section 90.401 definition of relevancy is the concept of materiality; the evidence must `tend to prove or disprove a material fact.' When evidence is offered to prove a fact which is not a matter in issue, it is said to be immaterial." Ehrhardt, supra, § 401.1. Although the credibility of a witness is always in issue, we do not interpret this so broadly as to permit a party to call an opposing party's expert witness, whom the opposing party does not call, solely for the purpose of discrediting him.
In closing argument, it appears clear that the primary purpose Jordan called Sullivan as his witness and read excerpts from his deposition was to discredit the basis for Sullivan's opinions that were never even given in the case. Counsel told the jury that Dr. Sullivan gave an opinion early in the case that did not change (although that opinion was never revealed to the jury), and that Sullivan admitted he did not have "the entire picture" with regard to Jordan. Even though none of the defendants mentioned Sullivan's deposition in their closing arguments, on rebuttal Jordan's counsel again emphasized that the defendants did not call Sullivan and that Sullivan and the defendants' other expert did not have all the information on Jordan. Comparing that to his own retained experts, counsel noted all of his experts' opinions were based upon all of Jordan's information and tapes. He then said, "[h]ere's why they didn't do it. They closed their eyes for a very specific reason. In one case of Dr. Sullivan, he didn't read this information because he never even knew it existed. They didn't even tell him." (Emphasis added). Later, counsel told the jury that "Dr. Sullivan never even got to come in and tell us about his arm-chaired prospective [sic] on this case." All these statements show that Dr. Sullivan was used solely to denigrate the defense.
Although we can find no Florida cases directly addressing this use of an expert by an opposing party, in Niemann v. State, 471 S.W.2d 124, 129 (Tex.Civ.App. 1971), rev'd on other grounds, 479 S.W.2d 907 (Tex.1972), a condemnation case, the trial court refused to allow a property owner to call an expert appraiser for the state to show that he appraised the property for higher than the appraiser that the state actually called at trial and to show that other appraisers not called by the state also valued the property. The appellate court affirmed, noting that it was clear from counsel's statements at trial that the attorney wanted to call the witness simply to show the state acted improperly in not calling them. See id. As that testimony was not relevant to the issues in the case, the testimony was inadmissible. Similarly, Sullivan's testimony was inadmissible in this case.

(3) Remaining Issues

The court permitted the playing of Jordan's taped statement to the police because counsel represented that it was a prior consistent statement admissible under section 90.801(2)(b). However, halfway through the statement, the judge concluded that he had been misled by counsel and that the statement was improper. The remainder of the tape was not played. We agree with the trial court that the tape was inadmissible hearsay. It did not constitute a rebuttal to a charge of recent fabrication, and it introduced some new matters, particularly regarding Jordan's *350 family's opposition to his going to the church and his retention of a lawyer. It should not have been admitted.
We conclude that the other evidentiary issues raised were not an abuse of discretion. The admission of the "Brenda Cole" tape without a proper authentication predicate was harmless. Defendants did not object on authentication grounds when that tape was played to the jury prior to its admission into evidence. The admission of part of Jordan's deposition in his case-in-chief also was not an abuse of discretion, where the defendants played a substantial portion of Jordan's several depositions for the jury and, in any event, we would consider any error harmless.

Conclusion
We conclude the two evidentiary errors addressed above were sufficiently harmful to require reversal for a new trial in this very unusual and close case. Jordan made many, many inconsistent statements and continually made new and unusual accusations throughout the trial, demonstrating the level of his mental incapacity. The existence or non-existence of the video tape was a feature of the trial, and many witnesses were asked about whether it existed. Therefore, the judge's instruction permitting the jury to make unfavorable findings against the defendants may have had a significant impact on the trial. Together with the improper discrediting of Dr. Sullivan, both errors had a significant effect of undermining the defense case. For these reasons, we reverse and remand for a new trial as to all defendants.
Reversed and remanded for a new trial.
TAYLOR, J., and LENDERMAN, JOHN C., Associate Judge, concur.
NOTES
[1] Masters had argued on appeal that he too should have been entitled to a directed verdict on First Amendment grounds. He concedes that Doe v. Evans is controlling, although he does not concede the issue, as he maintains that the United States Supreme Court is the final arbiter of federal constitutional issues.
[2] We would suggest to the Supreme Court Committee on Standard Jury Instructions that Instruction 2.3 be amended to include in its notes that an adverse inference charge is likewise not generally appropriate.
[3] Because it was not raised at trial, reversal is not predicated on this ground.